DALLAS HOTEL CO. v. FOX et al.

(No. 1171.)

(Court of Civil Appeals of Texas. Amarillo. May 30, 1917. Rehearing Denied June 20, 1917.)

1. NEGLIGENCE ⊚⟹2—DUTY TO USE CARE.

Plaintiff's decedent, a watchman in a department store, received injuries in an elevator from which he subsequently died. Defendant, who had charge of other elevators in the same building, also kept in order the elevator by which decedent was killed, but as a volunteer merely. *Held*, that defendant owed no duty to decedent to exercise care in maintaining the elevator in good order.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 3, 4.]

2. NEGLIGENCE ⊚⟹2—ELEMENTS—BREACH OF DUTY.

A necessary element of negligence is a legal duty, and without the legal duty resting upon the party charged with the breach thereof there can be no negligence or other species of tort.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 3, 4.]

3. NEGLIGENCE ⊚⟹2—DUTY TO USE CARE— "MISFEASANCE"—"NONFEASANCE."

Where plaintiff's decedent was killed by an elevator which had been habitually looked after by the employés of the defendant, if such defendant had agreed to keep such elevator in a state of repair, and had at any time prior to the accident performed such duties, its failure to continue so to do was a misfeasance for which it would be liable; the distinction between nonfeasance and misfeasance being that in one case if the agent had never entered upon the performance of an undertaking for the principal as he had agreed to do he is liable to his principal, but not to third persons, although they may also have suffered injury by reason of his nonperformance, but if he has actually entered upon his undertaking he will be liable to third persons by reason of his failure to exercise reasonable care in its performance.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 3, 4.

For other definitions, see Words and Phrases, First and Second Series, Misfeasance; Nonfeasance.]

4. TRIAL ⊚⟹352(7)—SUBMISSION OF ISSUES— SEPARATING—CONTRIBUTORY NEGLIGENCE.

In an action for death resulting from personal injuries, it was error to submit the question of contributory negligence, and to refuse to submit special issues requested by defendant presenting the several grounds of contributory negligence separately; Vernon's Sayles' Ann. Civ. St. 1914, art. 1984a, entitling defendant to have separate grounds of defense and issues made by the pleas submitted distinctly and separately without being intermingled with each other.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 844.]

5. TRIAL ⊚⟹232(2)—SPECIAL ISSUES—SUBMISSION.

Where the court in an action for wrongful death submits special issues to the jury, it should not submit charges either general or special in connection therewith, except for the purpose of explanation or definition.

6. EVIDENCE ⊚⟹126(2)—RES GESTÆ—STATEMENTS.

Where plaintiff's decedent was killed by a falling elevator, testimony as to statements by him to another person about an hour after the injury as to how it happened was not objectionable as not being part of the res gestæ.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 373.]

7. TRIAL ⊚⟹412—RECEPTION OF EVIDENCE— WAIVER OF OBJECTION.

In an action for injuries resulting in death, defendant did not waive his right to object to the admission of a statement made by deceased as part of the res gestæ by cross-examining the witness by reference thereto.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 182, 974–977.]

8. JUDGMENT ⊚⟹631—BAR OF CAUSE OF ACTION.

Where plaintiff had recovered from decedent's employer and its indemnitor, under Workmen's Compensation Act (Acts 35th Leg. c. 103) had received payment and executed a release, her suit against a third person for the injury was barred.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1064, 1088, 1147.]

9. PLEADING ⊚⟹364(1)—STRIKING OUT ALLEGATIONS—EXCEPTIONS.

In an action for injuries resulting in death, allegations in the complaint that the son of decedent was in an orphan's asylum, that decedent was so crushed that he could not work, detailing his difficulties in extricating himself, that he was without means, and that plaintiffs were solely dependent upon him, should have been stricken upon exception taken thereto.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 1156, 1158, 1160.]

10. EVIDENCE ⊚⟹143—MATERIALITY—OWNERSHIP OF STOCK.

In action for injuries resulting in death, statements from defendant's minute book showing the ownership of its capital stock *held* inadmissible as being immaterial.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 424, 426–428.]

Appeal from District Court, Dallas County; Kenneth Foree, Judge.

Action by Gussie Fox and others against the Dallas Hotel Company. Judgment for plaintiffs, and defendant appeals. Reversed and remanded.

A. P. Wozencraft and S. P. English, both of Dallas, for appellant. Etheridge, McCormick & Bromberg, of Dallas, for appellees.

HALL, J. Mrs. Gussie Fox, plaintiff below, for herself and as guardian of her two children, sued appellant hotel company for damages on account of the death of her husband, Alexander Fox. The pleadings of the parties are voluminous, and for the purposes of this opinion it is sufficient to state briefly the substance of the allegations and in consideration of the various assignments when necessary, to set out the particular parts of the pleadings of either party pertinent to the assignment under consideration. A summary of plaintiff's petition is that the husband was in the employ of A. Harris & Co. as night watchman; that Harris & Co., under a lease from estate of Adolphus Busch, occupied the first five floors and basement of the Busch building in Dallas; that Fox's duties involved the use of a hydraulic elevator,

which extended from the basement of the Busch building to the sidewalk; that defendant, Dallas Hotel Company, owned and operated the Adolphus Hotel, and prior to the accident resulting in the death of Fox had undertaken to maintain the hydraulic elevator in repair for A. Harris & Co.; that defendant negligently failed to keep said elevator in repair, and while Fox was using it, causing it to descend, the elevator, from some cause, stuck and stopped; that he then placed a portion of his body beneath the elevator in an effort to ascertain the cause of the trouble, and while in this position the elevator, of its own motion, renewed its descent and caught and injured him, from which injury he died within a few hours. The defendant answered with general demurrer and certain special exceptions, a general denial, and affirmatively pleaded in substance that its agreement to maintain the elevator in question was not made until two months after the death of Fox, and that at the time of the accident to Fox it was not obligated in any way to keep the elevator in repair, and could not be held for failing to do that which it was not obliged to do; that in fact it was under an obligation to maintain those elevators which served the office part of the Busch building, and as defendant's employés were in the Busch building the defendant through them voluntarily inspected and otherwise looked after the hydraulic elevator from time to time, even before the death of Fox, but that the fact that certain care of such elevator was voluntarily rendered did not make defendant liable for failing to continue that care; that subsequently to the death of Alexander Fox plaintiffs had sued A. Harris & Co., the employer of deceased, and judgment was rendered against plaintiffs; that subsequently plaintiffs gave a complete release to A. Harris & Co., extinguishing their cause of action in consideration of $3,625.61, received as damages and compensation on account of the death of Alexander Fox; that the suit, judgment, release, and payment were a bar to the present action; that the payment was a payment pro tanto on any damages sustained and should be taken as an offset in the present suit; that Fox was guilty of contributory negligence in putting part of his body underneath the elevator, in failing to operate the elevator up and down until the sticking, if any, was overcome, and in failing to lock the elevator in place by closing the outlet water valve before going under the elevator, in putting part of his body under the elevator without having locked it in position, and in not getting entirely in the elevator pit, if he was going to get under the elevator at all. The case was submitted to a jury upon special issues and a verdict returned, upon which the court entered judgment against the defendant for $9,000.

[1] Under the first assignment appellant insists that the court should have directed a verdict in its favor, and the proposition is urged that in a suit brought by the representatives of a servant, not against his master, but against defendant, a third party, based upon the failure of defendant to maintain in repair an elevator leased by the master from a fourth party, and furnished by the master to the servant where there is no evidence that defendant was bound or obligated to so maintain the elevator, a verdict for defendant should be instructed. The Busch building in Dallas is a 16-story structure, owned by the estate of Adolphus Busch, the basement and five stories of which are occupied by A. Harris & Co. as a department store. The remaining stories are leased for office purposes. The lease contract between A. Harris & Co. and the estate of Adolphus Busch provides that Harris & Co. will, at its own cost, keep and maintain the leased premises in good order and repair, including the elevators. Except the hydraulic elevator, which injured Alexander Fox, the remaining elevators which served the building were operated by electric power. Harris & Co. had in their employ a machinist and engineer by the name of Parks, whose duty it was to care for the elevators in use in that part of the building leased and occupied by Harris & Co. Defendant hotel company also had two engineers, Long and Tucker, to care for and look after the elevators and other machinery of the Busch building. It appears that these parties, at least to some extent, undertook to care for the elevators which served that part of the building occupied by Harris, as well as the elevators serving the offices in the upper floors of the building. Appellee contended that appellant was under contract with Harris & Co. to care for all elevators used by said company, and especially the hydraulic elevator where the accident occurred. Appellant's contention is that the care of the elevators by its employés, Long and Tucker, was voluntary and without any compensation whatever, and denied that it had any such contract with Harris & Co.

The second assignment of error is based upon this portion of the general charge:

"You are instructed that defendant owed to Alexander Fox the duty to exercise ordinary care to maintain the elevator in question in a reasonably safe condition for his use."

The objection to this charge is that:

"The court assumes and informs the jury that the defendant did owe such duty, that the court assumes that there was such obligation on the part of defendant, and that the court assumes that there was an agreement on the part of the defendant to exercise ordinary care to maintain the elevator in question in a reasonably safe condition."

The first and second assignments will be considered together. The charge in the petition is that there was an agreement or some sort of an arrangement between appellant hotel company and Adolphus Busch, whereby

the hotel company, by and through its operatives, had the management and control of all elevators in the Busch building, and that through its operatives the hotel company undertook for and on behalf of A. Harris & Co. to supervise and keep in repair all of said elevators used by A. Harris & Co., and to that end there was also an agreement by and between appellant and Harris & Co. It appears that Harris & Co. moved into the Busch building about the 17th of November, 1913. The accident resulting in the death of Fox occurred January 31, 1914. In the lease contract between Harris & Co. and the owners of the Busch building, we find these stipulations:

"Lessee (A. Harris & Co.) hereby agrees and covenants with lessor (the estate of Adolphus Busch) to procure from the proprietors of the Adolphus Hotel (situated in the city of Dallas, Tex.) all heat required by lessee for heating said leased premises, the same to be furnished at a reasonable cost, and if lessee and the proprietors of the said Adolphus Hotel are unable to agree upon the reasonable cost thereof, then such cost shall be determined by a board of arbitration, consisting of three members, whose written award or the award of two members thereof shall be conclusive and binding. Lessee shall select one member of said board, the proprietor of the Adolphus Hotel shall select a second, and the two men so chosen shall select a third, provided, however, that if the proprietors of the Adolphus Hotel are unable at any time to supply said leased premises with the necessary agency to properly heat the same, then the lessors agree to install in the Busch building a good and sufficient heating plant of modern type, for the use thereof, and to thereby heat the leased premises for a reasonable compensation for such heat, to be agreed upon in writing by the parties thereto."

Following this is a similar stipulation with reference to the supply of electric current for light and power. It appears that about two months after the death of Fox the arbitration provided for by these two paragraphs of the lease contract was entered into, resulting in an award that Harris & Co. should contribute $100 a month for the time they had occupied the Busch building; said amount being contributed for the purpose of paying appellant's engineers, Long and Tucker, for such services as had been rendered in looking after the particular elevators which served the A. Harris & Co. part of the building. Appellant quotes at length the testimony of Arthur L. Kramer, the president of A. Harris & Co., and Geo. E. Wells, supervising engineer of the Anheuser Busch Brewing Association, with reference to the existence of an agreement or contract binding appellant to look after the Harris & Co. elevators. Upon this issue appellee quotes from the testimony of Long, Tucker, and Wells, tending to show that such an agreement existed. It is unnecessary to set out the testimony of these witnesses in the opinion. Suffice it to say that it is sufficient to support the finding of the jury in favor of the contention of either party. Such being the case, the court erred in assuming that appellant owed to Alexander Fox the duty to exercise ordinary care to maintain the hy-draulic elevator in a reasonably safe condition for his use, and did not err in refusing to peremptorily instruct the jury to find for appellant.

[2, 3] Since the cause must be remanded it is necessary for us to discuss the issues of law presented by the briefs. If upon another trial it should be found that there was no agreement between A. Harris & Co. and the Dallas Hotel Company that the latter would keep the elevators in that part of the building occupied by Harris & Co. in repair, then appellant would not be liable. This is because neither the relation of master and servant nor principal and agent between Harris & Co. and the Dallas Hotel Company existed. If the services theretofore rendered in maintaining the elevators by the Dallas Hotel Company were voluntary and gratuitous, it should not be held for failing to do something which it was under no obligation to do. A necessary element of negligence is a legal duty and without a legal duty resting upon the party charged with the breach of such duty there can be no negligence or any other species of tort. Mexican National Railway Co. v. Crum, 6 Tex. Civ. App. 702, 25 S. W. 1126; Galveston, etc., Ry. Co. v. Hennegan, 33 Tex. Civ. App. 314, 76 S. W. 452; I. & G. N. Ry. Co. v. Vallejo, 102 Tex. 70, 113 S. W. 4, 115 S. W. 25; Dobbins v. Missouri, etc., R. Co., 91 Tex. 60, 41 S. W. 62, 38 L. R. A. 573, 66 Am. St. Rep. 856. If, however, it should appear that the Dallas Hotel Company had bound itself to maintain and keep the elevator in question in a state of repair, we think it is liable for the damages involved. The best discussion of the principles, which in our opinion govern this case, is by an eminent text-writer, from whom we quote as follows:

"It is sometimes said that in torts the relation of principal and agent does not exist. They are all wrongdoers, and the liability of each and all does not cease until payment has been made or satisfaction rendered, or something equivalent thereto. While this statement undoubtedly requires some qualification it is nevertheless declaratory of a more or less general principle, and it is, as will be seen in the many cases, true that the fact that the wrongdoer purported to do the act as agent for another is entirely immaterial so far as his own liability is concerned. That fact may make the alleged principal liable also; but it will, in many cases, have no tendency to exonerate the alleged agent." 1 Mechem on Agency (2d Ed.) § 1452.

"So if an agent or servant, while acting upon his master's business, so negligently acts as to cause direct and immediate injury to the person or property of a third person, whether he be one to whom the master owes a special duty or not, under circumstances which would impose liability on the agent or servant, if he were acting under the same conditions on his own account, he will be personally liable. In practically every case in which the master could be held liable for the negligence of his servant the servant himself is personally liable. This must be so from the very nature of the case. The whole theory of the master's liability is that the servant has done a legal wrong for which the law imposes a liability upon the master, however innocent he may be. The person actually and primarily at fault, however, is the servant, and if

he would not be liable the master ordinarily cannot be. The liability of the servant is the direct and primary one; that of the master is a secondary and imputed one." Id. § 1460.

"The liability of the agent in these cases is not affected by the fact that there is no privity of contract between himself and the person injured. His liability does not depend upon privity, but upon the general duty imposed on every one to so govern his conduct as not to negligently injure another." Id. § 1461.

"When the question of the agent's liability to third persons for negligent omissions to act is reached, a problem of greater difficulty is presented." Id. § 1464.

"'It is often said in the books that an agent is responsible to third persons for misfeasance only and not for nonfeasance, and it is doubtless true that if an agent never does anything towards carrying out his contract with his principal, but wholly omits or neglects to do so the principal is the only person who can maintain any action against him for the nonfeasance; but if the agent once actually undertakes and enters upon the execution of a particular work it is his duty to use reasonable care in the manner of executing it so as not to cause any injury to third persons which may be the natural consequence of his acts, and he cannot by abandoning its execution midway and leaving things in a dangerous condition exempt himself from liability to any person who suffers injury by reason of his having so left them without proper safeguard. This is not nonfeasance or doing nothing, but it is misfeasance, doing improperly.' * * * So in the Louisiana case above referred to it is said: 'Every one, whether he is principal or agent, or is responsible directly to persons injured by his own negligence in fulfilling obligations resting upon him in his individual character, and which the law imposed upon him independent of contract. No man increases or diminishes his obligation to strangers by becoming an agent. If in the course of his agency he comes in contact with the person or property of a stranger he is liable for any injury he may do to either by his negligence in respect to duties imposed by law upon him in common with all other men. * * * The whole doctrine on that subject culminates in the proposition that wherever the agent's negligence consists in his own wrongdoing, therefore if an act directly injures a stranger, then such stranger can recover from the agent damages for the injury.'" Id. § 1465.

"The attempted distinction between misfeasance and nonfeasance has been very much criticized and often denied to exist. It is undoubtedly true that the Latin names employed may not be very appropriate or illuminating. Notwithstanding this, however, it is believed to be true that there is a real distinction lying back of these phrases which it is important to discover and which is not more vague or indefinite than many other distinctions which it is necessary in our law to recognize. It is sometimes said that the only distinction if one exists is to be found in the fact that in one case the agent has, while in the other he has not, actually entered upon the performance of an undertaking which he has assumed for his principal. In the latter case it is said that if he had never entered upon the performance at all, as he had agreed to do, he is liable to his principal for not performing, but that he will not be liable to third persons, although they may have also suffered injury by reason of his nonperformance. In these cases the agent's duty will often be merely a contractual one, and the third persons are not parties to the contract." Id. § 1466.

"It is said, however, that while the agent may not be liable if he never enters upon his undertaking, yet if he has actually entered upon the performance of his duties he will be liable to third persons who are injured by reason of his failure to exercise reasonable care and diligence in their performance." Id. § 1468.

2 C. J. p. 825, § 499, defines nonfeasance as follows:

"As generally stated, nonfeasance is distinguished from misfeasance * * * in that nonfeasance is the omission of an act which the agent ought to do, whereas misfeasance is the improper doing of an act which he may lawfully do."

Reference to the authority cited shows there is great contrariety of opinion and confusion in the cases from various jurisdictions discussing this question. The weight of authority, however, sustains the views announced by Mechem and quoted above. Wells v. Hansen, 97 Kan. 305, 154 Pac. 1033, L. R. A. 1916F, 570, and annotations; Mayer v. Thompson-Hutchison Building Co., 104 Ala. 611, 16 South. 620, 53 Am. St. Rep. 88, 28 L. R. A. 433, and note; Ward v. Pullman Co., 131 Ky. 142, 114 S. W. 754, 25 L. R. A. (N. S.) 343, and note; 2 C. J. p. 826, §§ 499, 500, and notes. The Texas courts uniformly hold that an agent is personally liable to third parties for misfeasance. Eastin & Knox v. T. & P. Co. et al., 99 Tex. 654, 92 S. W. 838; Mathonican v. Scott, 87 Tex. 396, 28 S. W. 1063; Continental Fruit Express Co. v. Leas, 50 Tex. Civ. App. 584, 110 S. W. 129; St. Louis Iron Mt. & Sou. Ry. Co. v. Bass, 140 S. W. 860; Jones v. Montague, 158 S. W. 1053; Parlin-Orendorff Co. v. Miller, 25 Tex. Civ. App. 190, 60 S. W. 881. Appellant relies upon the case of Labadie v. Hawley, 61 Tex. 177, 48 Am. Rep. 278, to sustain his contention that because the Dallas Hotel Company was the agent of Harris & Co., it cannot be held for the damages. In that case it appears that Hawley and Watts, through appellant, Labadie, as the agent of the owner of the building, had leased adjoining storehouses; in his part of the building Hawley carried on a business as a dealer in tobacco, cigars, etc., and Watts occupied his part of the premises in conducting a restaurant, and by the erection of a cooking range or oven damaged Hawley's stock of merchandise by the excessive and continued heat. Appellant Labadie testified that he was simply the owner's agent, with power only to lease the buildings, collect the rents, and remit the amount to the owners. Hawley made Watts and Labadie parties defendant, and recovered judgment against Labadie only. In the course of the opinion Judge Stayton uses this language:

"Neither the renting of the house nor the construction of the range has operated the injury of which the appellee complains. Whatever injury the appellee has received has resulted from the operation of the range by Watts, and if the appellant is responsible for his act it must be on the sole ground that he has not done something which he, as agent, might have done, and not on the ground that by any act of his has injury resulted to the appellee."

The writer then quotes from Ewell's Evans on Agency:

"The rule is that an agent is personally liable to third persons for something which he ought not to have done, but not for not doing something which he ought to have done."

The only thing which Labadie had not done was to require Watts to remove the oven or range. and place it in a position where it would work no injury to Hawley. Under his powers as the agent of the owner of the building, he clearly had no authority to require Watts to alter existing conditions. His was a limited agency, and his liability in that regard may be likened to that of the Dallas Hotel Company in the instant case if the evidence should show that it was in no way bound to keep the elevators serving Harris & Co. in repair. Appellant further cites us to the case of House v. Houston Waterworks Co., 88 Tex. 233, 31 S. W. 179, 28 L. R. A. 532, as sustaining its position. This was an action by a citizen of Houston against a public service corporation, seeking to recover damages because at the time of a fire which destroyed the plaintiff's property the waterworks company had not provided sufficient water to enable the fire company to save its property. After quoting from a number of similar cases, the Supreme Court, speaking through Brown, Justice, concludes that plaintiff is not entitled to recover under a clause in the contract between the waterworks company and the municipality, which provides that the waterworks company shall maintain a sufficient supply of water at any time in case of fire to throw six streams of water at one time 100 feet high, through 50 feet of 2½-inch hose, and 1⅛-inch nozzle, saying:

"It is true that plaintiff in error might have received benefit from the performance of the contract by the defendant, but 'it is not every promise made from one to another from the performance of which a benefit may inure to a third which will give a right of action to such third person, he being neither privy to the contract nor to the consideration. The contract must be made for his benefit as its object, and he must be the party intended to be benefited.'"

Upon the question of plaintiff's right to recover upon tort the rule is expressed thus:

"One who has a right of action upon a contract 'may sometimes sue either on the contract as such or in tort for the breach of it; but the right of a person not privy to the contract rests upon a different rule. The correct rule of law as to the right of a party to sue, as in tort for the breach of a contract, is thus well expressed in Shearman & Redfield on Negligence (section 116): 'Negligence which consists merely in the breach of a contract will not afford a ground of action by any one who is not a party to the contract nor a person for whose benefit the contract was avowedly made. * * * The true question is, Has the defendant committed a breach of duty apart from the contract? If he has only committed a breach of the contract he is liable only to those with whom he has contracted; but if he has. committed a breach of duty he is not protected by setting up a contract in respect to the same matter with another. This rule is well supported by authority. Cooley, Torts, p. 104, and note 1, same page; Moak's Underh. Torts, p. 23, rule 7; Id., p. 24, rule 8; Id., p. 25, subrule. The plaintiff is not party to or in privity with the contract. It was not made expressly for his benefit. The defendant has not been guilty of any breach of duty that it owed the plaintiff apart from the contract, nor growing out of any relations between them created by or arising out of the contract, and it is clear that plaintiff cannot maintain the action ex delicto for the breach of the contract itself.'"

Further on in the opinion the court seems to base the holding of nonliability upon the proposition that the waterworks company had undertaken a duty to the public at large, and concludes that because the city would not be liable for a failure to perform the same duty the defendant, acting under a contract with it, could not be charged with any greater responsibility, stating that if the city of Houston had contracted with the defendant that it was to be liable to individual citizens for losses sustained by fire under such circumstances as are shown, the contract would have been void because the city had no power to make such contract.

On account of the nature of the case and the status of the parties to the litigation, the holding is not applicable here. The only Texas case which we have been able to find in point with the one under consideration is Kenney v. Lane, 9 Tex. Civ. App. 150, 36 S. W. 1063. The facts in that case are that a bridge company had contracted to repair a bridge for the city of Ft. Worth. In the prosecution of the work certain iron pillars were being rolled upon wooden rollers along two pieces of timber laid across certain crossbeams placed where the floor should have been. One of the rollers slipped out and fell upon appellant, who was working beneath the bridge. Head, Justice, states the general rule that an agent is not liable to third persons for his mere nonfeasance or omissions of duty in the course of his employment. It was shown that the appellee's attention had been called to the dangerous condition which caused the accident on the day before. Judge Head quotes with approval the language of Chief Justice Gray in Osborne v. Morgan, 130 Mass. 102, 39 Am. Rep. 437, from which we quote as follows:

"But if the agent once actually undertakes and enters upon the execution of a particular work, it is his duty to use reasonable care in the manner of executing it, so as not to cause any injury to third persons which may be the natural consequence of his acts; and he cannot, by abandoning its execution midway and leaving things in a dangerous condition, exempt himself from liability to any person who suffers injury by reason of his having so left them without proper safeguards. This is not nonfeasance, or doing nothing; but it is misfeasance, doing improperly."

Our conclusion is that if appellant had agreed to maintain and keep the elevators in a state of repair, and had, at any time prior to the accident performed such duties, then its failure to continue to use reasonable care in an effort to keep them in a state of repair was a misfeasance, for which it would be liable. What is here said disposes of the third and fourth assignments.

[4] By the fifth, sixth, seventh, eighth, ninth, tenth, and eleventh assignments appellant complains because the court erred in submitting the question of contributory negligence to the jury as follows:

"Was Alexander Fox guilty of contributory negligence in his conduct in, around, or about the said elevator or the shaft thereof prior to or at the time he was injured?"

—and in refusing to submit to the jury five special issues requested by appellant presenting the several grounds of contributory negligence separately. As heretofore stated, the facts which appellant pleaded as constituting contributory negligence on the part of Fox are: (a) In putting part of his body underneath the elevator; (b) in failing to operate the elevator up and down until the sticking, if any, was overcome; (c) in failing to lock the elevator in place by closing the outlet water valve before going under the elevator; (d) in putting part of his body under the elevator without having locked it in position; and (e) in not getting entirely in the elevator pit if he was going to get under the elevator at all. We think these assignments must be sustained. Appellant was entitled to have the separate grounds of its defense and issues made by the pleadings "submitted distinctly and separately and without being intermingled with each other." Article 1984a, Vernon's Sayles' Civil Statutes; S. W. T. & T. Co. v. Andrews, 169 S. W. 218.

[5] Appellant complains under the twelfth, thirteenth, fourteenth, and fifteenth assignments that the court erred in refusing to give special charges in connection with the issue of contributory negligence submitted to the jury. These charges recite the facts alleged which appellant claims showed the contributory negligence of Fox in the different ways set out above. The rule with reference to submitting charges in connection with special issues is announced by Hodge, Justice, in T. & F. S. Ry. Co. v. Casey, 172 S. W. 729, and by Connor, Justice, in J. M. Guffey Petroleum Co. v. Dinwiddie, 182 S. W. 447, and is in substance that the court should not submit charges, either general or special, in connection with the special issues, except for the purpose of giving the jury explanations and definitions of legal terms used and which are necessary to enable the jury to understand the meaning of such terms. Vernon's Sayles' Civil Statutes, art. 1984a. General charges of a kind not specified by the statute, submitted in connection with special issues, tend to confuse the jury, and should not be given. Calvin v. Neel, 191 S. W. 791. None of the special charges requested and the refusal of which is complained of by these assignments were explanations or definitions within the meaning of the statute referred to.

[6] Under the sixteenth and seventeenth assignments appellant insists that the court erred in permitting the witness for plaintiff, S. G. Mansfield, to testify on direct examination as to what Fox told him as to how he sustained the injuries. The proposition is that where the injured party, after having moved himself without help from the place of the accident, and while quite cool and capable of clear thinking, made a statement to the witness, at least one hour after the accident, going very carefully over the statement several times to get it exactly right and to preserve it, such statement under such circumstances and under the other circumstances of the case is hearsay, and not res gestæ. There is no evidence in the record to show the facts and circumstances connected with the injury of Fox other than that detailed by Mansfield. The substance of defendant's fourth bill of exceptions, taken to the admission of this testimony, is as follows:

"Be it remembered that upon the trial of the above styled and numbered cause, while S. G. Mansfield was on the witness stand as a witness for plaintiff and after he had testified on direct examination that about 1 o'clock on the night of the accident he was attracted by a commotion near the Ackard street entrance of A. Harris & Co.'s store, and on going there and looking in saw Fox sitting on the inside of the double doors of A. Harris & Co.'s and went in to him, the following questions were asked the witness on direct examination by plaintiff's counsel, and the following replies were made by the witness: Q. Did, or not, Mr. Fox make any statement to you as to how he sustained the injury? A. Yes, partly. Q. What was Mr. Fox's physical condition at that time—at the time you got to him? A. Good. Q. No, at the time you broke in and got to him. A. Rational and all right. Q. Mentally all right? A. Yes, sir. Q. But his physical condition? A. His leg was broken all to pieces, and it didn't seem from the break in the same that he had relaxed to that extent that a man does after he is hurt. Q. Do you know whether or not Mr. Fox died from the injury, with which you found him suffering when you first got to him in A. Harris & Co.'s store? A. Yes, sir. Q. How long did he live after these injuries? A. Probably 60 hours; something like that. Q. When you first got to him there in the store of A. Harris & Co. what, if any, statement did he make to you as to how he sustained the injuries that you then found him suffering from? A. When I got to Mr. Fox I got down on the floor by the side of him, and, sitting on the floor, I says to him, 'Alexander, how did it happen?' And he says, 'I was running the elevator down to take up my trash as I have to, and it got within 18 inches or 2 feet of the floor and hung.' He says, 'I put down my right hand on the elevator and swung kind of under it to peep under to see what it was hung on, and as I got down in that position it came down and caught my right leg and my left hand. I finally worked my way out with my left hand after it crushed me up. I finally kept on until I got my left out of there, and after I got it out I crawled up to the other elevator. He says, 'I crawled over to the other elevator and went up and crawled from over there back to the door and broke out the glass with my shoe heel to attract attention when you found me. I came here and broke out this glass, where you found me.'"

The defendant's objections to this testimony, as shown by the bill of exception, are as follows:

"We object to the witness answering the question and stating what Mr. Fox told him for the reason that such statements, if any, by Mr.

Fox, repeated by this witness are hearsay, and the statements of Fox are not a part of the res gestæ, and were a mere narrative of past events, and were self-serving declarations made by Fox and they were not made under such circumstances as to preclude the idea that Fox was stating the situation so as to throw the responsibility on some one other than himself, and because any statements he then made were self-serving statements, made in his own interest."

Appellant's seventh bill of exceptions quotes the last question and answer set out in the preceding bill of exceptions, together with the objections made and quoted above, and contains the following:

"Thereupon counsel for detendant took the witness on cross-examination and asked the witness the following questions, and the following replies were made: Q. You say you were a member of the same lodge as Mr. Fox? A. Yes. Q. You were a very close friend of his? A. Yes. Q. Now, after he made the statements to you there at A. Harris & Co.'s, did you go over the statements with him? A. Yes. Q. Did you go over it carefully with him? A. Yes. Q. At that time? A. Yes. Q. Did you go over it with him very carefully at any other time? A. Yes. Q. How many times did you go over it with him carefully? A. I went over it with him pretty well. Q. Tell me the number of times. A. Several times; I don't remember just how many; several times. Q. You went over and over the statements to be sure you had it all right? A. Yes, because I believed he was going to die. Q. You wanted to preserve the statement? A. I felt that I ought to do it. Q. What did you and Mr. Fox have in mind in going over that statement? A. I could not say what Mr. Fox had in mind. Q. You don't know what he had in mind? A. No, I don't. Q. He seemed disposed to go over it carefully with you? A. At my request; yes. Q. He did go over it very carefully with you? A. I think so; yes. Q. How long was it after the accident that Mr. Fox made the first statement to you? A. He told me that he had been hurt about an hour. Q. It was then that he went over the statement with you? A. The first one. Q. He went over it very carefully with you? A. Yes. Q. What condition was Mr. Fox in mentally when you first saw him? A. He was quiet and cool. Q. Capable of clear thinking? A. Yes, I think so; suffering a great deal from his wounds. Q. But he was standing that all right? A. Yes."

As shown, this is a narration of the occurrence, made in reply to a question propounded to Fox about one hour afterward. The decisions in this state are not in harmony upon the question of the admissibility of such a statement. The following authorities hold that it is admissible as res gestæ, although it is a narration of the facts and circumstances which caused the injury, but in none of them was the statement made as much as an hour after the accident: Galveston v. Barbour, 62 Tex. 172, 50 Am. Rep. 519; I. & G. N. Ry. Co. v. Smith (Sup.) 14 S. W. 644; T. & P. Ry. Co. v. Hall, 83 Tex. 675, 19 S. W. 128; T. & P. Ry. Co. v. Robertson, 82 Tex. 657, 17 S. W. 1041, 27 Am. St. Rep. 929; H. & T. C. Ry. Co. v. Loeffler, 51 S. W. 536; I. & G. N. Ry. Co. v. Hugen, 45 Tex. Civ. App. 326, 100 S. W. 1000; T. & P. Ry. Co. v. Barron, 78 Tex. 421, 14 S. W. 698. In I. & G. N. Ry. Co. v. Anderson, 82 Tex. 516, 17 S. W. 1039, 27 Am. St. Rep. 902, Gains, Justice, said:

"All declarations or exclamations uttered by the parties to a transaction, and which are contemporaneous with and accompany it, and are calculated to throw light upon the motives and intention of the parties to it, are clearly admissible as parts of the res gestæ. Very respectable authorities restrict the doctrine of res gestæ within the limits indicated by the foregoing definition, and exclude all declarations which are a narration of past occurrences. This is a convenient and salutary rule, and probably the more logical one; and, if it were an open question in this state, we should hesitate long before adopting another. Another rule, applied in many of the American courts at least, is to admit as parts of the res gestæ not only such declarations as accompany the transaction, but also such as are made under such circumstances as will raise a reasonable presumption that they are the spontaneous utterance of thoughts created by or springing out of the transaction itself, and so soon thereafter as to exclude the presumption that they are the result of premeditation or design."

In Pilkinton v. G., C. & S. F. Ry., 70 Tex. 226, 7 S. W. 805, it is said:

"On the trial appellants proposed to prove, by the witness Sofora Pilkinton, as part of the res gestæ, the substance of a statement made to her by her husband, Frank Pilkinton, three hours after he received the injuries, as to how the injuries occurred. On objection this testimony was excluded, and appellants contend that this was error. As to what is res gestæ depends much upon the circumstances of each particular case. The doctrine is based on the presumption that declarations made at the time of the act, or transaction, or event to which they relate, evoked by it without premeditation, are part of the act, or transaction, or event. To be a part of the res gestæ the declarations are not required to be precisely concurrent in point of time with the principal transaction, if they spring out of it, are voluntary and spontaneous, and are made at a time so near as to preclude the idea of deliberate design. McGowen v. McGowen, 52 Tex. 657. The rule is very latitudinous, and its application must be left largely to the judicial discretion of the trial court. Where the circumstances of the case render it probable that a statement offered as res gestæ is the result of premeditation or deliberate design to effect a certain purpose, it should not be received."

The following cases tend to support appellant's contention: T. & N. O. Ry. Co. v. Crowder, 70 Tex. 222, 7 S. W. 709; Roth v. Travelers' Protective Ass'n, 102 Tex. 241, 115 S. W. 34, 132 Am. St. Rep. 871, 20 Ann. Cas. 97; St. Louis & Southwestern Ry. Co. v. Gill, 55 S. W. 386; Malone v. Texas & Pacific Ry. Co., 49 Tex. Civ. App. 398, 109 S. W. 430; M., K. & T. Ry. Co. v. Tarwater, 33 Tex. Civ. App. 116, 75 S. W. 937; Ft. Worth & Denver City Ry. Co. v. Stone, 25 S. W. 808. From a review of all the Texas decisions we conclude that the law of this state is that the statement is not objectionable because it is a narration of the facts at the time of the accident, though the weight of authority elsewhere seems to be otherwise. 42 L. R. A. (N. S.) 953, note. The only question upon which we entertain any doubt is the length of time intervening between the accident and the making of the statement to Mansfield, but the record shows that Fox was painfully and fatally injured, and was doubtless suffering intensely; in fact he was injured to such

an extent that he died within about 60 hours, and this would tend to rebut the idea that his statement was made with premeditation and design. The fact of his death soon afterwards is an element which the court may consider in determining the admissibility of his statement. 10 R. C. L. 172.

[7] Appellant did not waive his right to object to the admissibility of this evidence because of the facts elicited from the witness Benno. This witness did not give any of the facts immediately surrounding the occurrence as detailed to him by Fox, nor did appellant waive his right to object by cross-examining the witness Mansfield with reference to the statements made to him by Fox, describing the occurrence. Cathey v. M., K. & T. Ry. Co., 104 Tex. 39, 133 S. W. 417, 33 L. R. A. (N. S.) 103.

[8] Plaintiffs excepted generally to section 8 of appellant's answer. This section of the answer set up as a defense a former suit by appellees against A. Harris & Co., and its indemnitor, the Fidelity & Casualty Company of New York, and sets out in full the petition in that case, and the judgment rendered by the court. The pleading so copied shows that plaintiffs sought a recovery against the Fidelity Company under the Workmen's Compensation Act, and at the same time, by appropriate allegations and prayer, claimed damages against Harris & Co. for negligence. The judgment was rendered against the Fidelity Company for $1,402, and in favor of Harris & Co., dismissing it with its costs, and is shown to be final. This section of defendant's answer also set out a release signed by appellee Mrs. Fox for herself and as guardian of her children, reciting in substance that whereas Alexander Fox was injured on the 30th day of January, 1914, "under circumstances which I claim render A. Harris & Co. and the Fidelity & Casualty Company liable to me and to Herman Fox and Freda Fox, minors, in damages, and whereas, both parties desire to compromise and have agreed to adjust and settle the matters for the sum of $3,625.61: Now, therefore, in consideration of said sum paid by A. Harris & Co. and the Fidelity & Casualty Company, I do hereby compromise said claim and release and forever discharge said A. Harris & Co. and the Fidelity & Casualty Company, their agents and employés, from any and all liability by reason of said injuries." Said section 8 of defendant's answer further declares that the sums named in said judgment and in the release were paid, and that by reason of such suit and final judgment the matters and things in this suit have been adjudicated. It is further alleged that the release given by plaintiffs was a complete extinguishment of plaintiff's cause of action on account of the accident to and death of said Fox, and operates as a release of the defendant. The court sustained the general exception to this section. The judgment is dated July 30,

1915, and the agreement settling the controversy bears date August 19, 1915. Were it not for the Workmen's Compensation Act we would hold that for the consideration recited therein the release of Harris & Co. "and their agents and employés from any and all liability by reason of said injuries" is an accord and satisfaction of the appellees' claim, and that they could not maintain this suit. El Paso & S. Ry. Co. v. Darr, 93 S. W. 166; Robertson v. Trammell, 37 Tex. Civ. App. 53, 83 S. W. 258; 1 C. J. 536. The duty rested upon Harris & Co., primarily to furnish deceased a safe place in which to work, and such duty was not delegable. If appellant had, by contract with Harris & Co., undertaken to keep the elevator in repair, and the conditions as hereinbefore discussed were such as to render it liable for misfeasance, then Harris & Co., and appellants are joint tortfeasors, and appellees could have sued either one or both, and, if both, then in the same or separate actions; and if more than one judgment resulted they would have been put to their election de melioribus damnis (1 Jaggard on Torts, 341), though they would be entitled to but one satisfaction. McGehee v. Shafer, 15 Tex. 198; Thompson v. Albright, (Tex. App.) 14 S. W. 1020. The release recites the settlement of the claim, and, having been executed since the rendition of the judgment, must be taken as full satisfaction of it. The effect of the Workmen's Compensation Act upon the controversy is the Vimy Ridge of this contest. It is clear that the judgment was entered for the amount found to be due under the compensation law, and we think the defendant has so alleged. If the recovery had been by reason of the negligence of Harris & Co., there should not have been any judgment against its indemnitor, the Fidelity Company (Texas M. R. R. v. Miers, 37 S. W. 640), and the fact that the decree is against the Fidelity Company only (discharging Harris & Co.) implies that it was entered in accordance with the requirements of the compensation law. Vernon's Sayles' Civil Statutes, arts. 5246yyyy and 5246i; Marshall M. & E. Co. v. Scharnberg, 190 S. W. 229. Article 5246yyyy provides that any insurance company within this state shall have the right to insure the liability to pay the compensation provided for by articles 5246h–5246o, and when such company issues a policy so conditioned the holder of such policy shall be regarded as a subcriber so far as applicable under the act, and when such company insures such payment of compensation it shall be subject to the provisions of articles 5246h–5246qqq, 5246yyy–5246zzzz, and of articles 5246u, 5246ww, and 5246xxx, upon filing with the commissioner of banking its classification of premiums. Article 5246i provides that the representatives of beneficiaries of deceased employés shall have no right of action against subscribing employers for injuries resulting in death, but such representa-

tives and beneficiaries shall look for compensation solely to the Texas Employés' Insurance Association. Article 5246ii provides that employés, whose employers are not, at the time of the injury, subscribers to said association, and the representatives and beneficiaries of deceased employés, who at the time of injury were working for nonsubscribing employers, cannot participate in the benefits of said insurance association, but they shall be entitled to bring suits, and may recover judgment against such employers or any of them. "The Texas act is strictly elective as to the employer, but election as to the employé is only as to acceptance or rejection of employment by one who may or may not be a subscriber. If the employment is accepted from a subscriber with the notice provided by law that the employer is a subscriber, the employé then has no further election. * * * Ordinarily, of course, as under our statute, there is no difficulty in ascertaining whether the employer has elected to become subject to the provisions of the act; for, of necessity, his election is evidenced by records from which the fact may be readily ascertained." W. M. Rice v. H. R. Garrett, 194 S. W. 667.

We think the release executed by Mrs. Fox shows that the settlement was made with the Fidelity Company under the compensation act. Article 5246yyyy, supra, makes the assured, upon the acceptance of a policy, a subscriber, and provides that the insurance company itself shall be subject to the provisions of the act specified. This conclusion is confirmed by the fact that the judgment was entered against the only defendant who could be liable under these provisions. As an original proposition the Fidelity Company was in no sense liable to appellees, and but for the provisions of the act, the judgment could not have been properly entered against it. Having sued the party liable under the provisions of the act, and prosecuted their claim to judgment, appellees must be held to have elected to accept under the act, and we must presume that all necessary formalities required to bring the parties within the operation of the act have been complied with. Barry v. Bay State St. Ry. Co., 222 Mass. 366, 110 N. E. 1031. When the employer and employé have elected to come within the act, the remedy afforded by it is exclusive. Middleton v. Texas Power, etc., Co. (Sup.) 185 S. W. 556; Mitchell v. Louisville, etc., Ry. Co., 194 Ill. App. 77; McRoberts v. National Zinc Co., 93 Kan. 364, 144 Pac. 247; Shade v. Ash Grove Lime, etc., Co., 92 Kan. 146, 139 Pac. 1193; Piatt v. Swift, 188 Mo. App. 584, 176 S. W. 434. The act does not provide in express terms that the injured party or his beneficiaries shall have only one action for the recovery of compensation, as is provided in section 6a of the General Laws of the Thirty-Fifth Legislature (1917), p. 285, but appellant contends, and with much force, that the reasonable inference from the act of 1913 is that the right of appellees should be so limited. The purpose of the act, as stated, is to give to injured employés or their representatives in case of death compensation for the injury, regardless of the question of negligence, and we are not willing to hold that the intention of the Legislature is to enlarge the rights of employés to the extent of a double recovery. The compensation provided for by the act is in lieu of the right to recover against the tort-feasors. Section 6 of the act (Laws 1913, c. 179, pt. 2, § 6), which controls the rights of the parties where the injury results to the employés of independent contractors, or subcontractors, provides that such employés shall be entitled to compensation, and that "the associations shall, however, be entitled to recover indemnity from any other persons who would have been liable to such employés, independently of this section, and if the association has paid compensation under the terms of this section it may enforce in the name of the employés, or in its own name and for its own benefit the liability of such other persons." Clearly, under this section, injured employés of independent contractors and subcontractors could not recover against third parties whose negligence caused the injury. Employés of this character must look to the association alone for compensation, and the association has the sole right to institute suit against the party whose negligence caused the damage. The instant case, of course, does not come within the provision of this section, but if it is to be taken as an index of the legislative intent, appellees could not, after recovering under the act or accepting compensation in recognition of the provisions of the act, have a second recovery against a third party, or joint tort-feasor. We see no reason why a distinction should be made against the employés of independent contractors and subcontractors, and are strongly inclined to the opinion that the Legislature did not intend to give an alternative remedy to one who has received compensation under the act. In support of their contention that the settlement with the Fidelity Company and the judgment previously rendered against such company in their favor should not bar this action, appellees cite, amongst other cases, Missouri Pacific Ry. Co. v. Jarrard, 65 Tex. 560. Jarrard was an employé of the lessees of the state penitentiary, and at the time of the accident was a passenger upon appellant's road. Having been injured he filed suit for damages, and the fact was developed upon the trial that his employers continued to pay his salary during the time of his disability, compensating him fully for the time so lost. The railroad company endeavored to offset the damages recoverable by such payment, and the court said:

"If the continuance of his wages was a provision of his contract, or a grace of his employers, the defendant was not entitled to the benefit" thereof.

This holding has no application to this case. The payment made to Jarrard by his employer did not grow out of and had no connection whatever with his injuries, nor was it paid or received as compensation or damages for the negligence of the railroad company. The carrier was no more entitled to a credit for the amount paid than if some friend or relative had donated the same through pity for his misfortune. Appellees further cite the case of Nashville, C. & St. L. Ry. Co. v. Miller, 120 Ga. 453, 47 S. E. 959, 67 L. R. A. 87, 1 Ann. Cas. 210, in which the Jarrard Case is quoted with approval. In the Miller Case it appears that the suit was for damages for injury occasioned by the negligence of the railway company. Miller was a railway mail clerk, and under the provisions of section 1424 of the Postal Laws and Regulations, he was paid $1,400 by the United States Government for lost time. The railway pleaded the fact of such payment, and the trial court properly charged the jury that:

"It is immaterial whether the government paid the plaintiff anything or not; that would not affect the rights of the plaintiff in this case to recover against the company."

This charge was manifestly correct. The provision in the postal laws did not purport to compensate an injured railway mail clerk for the injuries sustained, but provided for payment, irrespective of the issue of liability. Appellee asserts that the compensation received by them under the act is analogous to payments made in pursuance of contracts, either of life or accident insurance, and that in accord with the holding of our courts that payments made in pursuance of such contracts of liability are not admissible in evidence we should hold that the amount received under the release has no bearing upon appellee's right to recover in this case. We cannot assent to this proposition. Payments made by life and accident insurance companies in such cases are in pursuance of a contractual liability with which the tort-feasor has no connection whatever, and for which the assured has personally paid a valuable consideration. The amount in such cases is paid because of the accident, and not as compensation for the injury suffered. Under the Texas act, if the facts bring the case within the terms of the statute, the injured party must receive his compensation according to its provisions, and his right to look to the tort-feasor is expressly denied. The effect of a release of one party and of an acceptance of compensation under such laws has been variously decided by the courts of different states, but it will be found upon examination that the great diversity of opinion is due almost entirely to the particular language of the several acts construed. 1 Honnold's Workmen's Compensation, §§ 189, 208. Whatever may be the rule under the statutes of other states, we think the judgment in appellees' favor was, under the Texas act, res judicata, and that the release evidences an accord and satisfaction. The court erred in sustaining the exception.

[9] Appellees alleged that Herman Fox was in an orphan asylum in the city of New Orleans, and further, that Alexander Fox was so crushed in body and limbs he could not walk; that by an Herculean effort he managed to extricate himself from the trap in which he had been caught unawares, and crawled through the basement of said building to another elevator, and, managing to manipulate the same, carried himself to the first floor of said building, where he broke out the glass of one of the doors and gave the alarm, whereupon some passersby and officers came to his rescue, and that the plaintiffs were upon all of the dates mentioned in the petition without means, and each and every one of them were solely dependent upon the earnings and contributions of the said Alexander Fox. Appellant excepted to these allegations, and the action of the court in overruling the exceptions is made the basis of the twentieth, twenty-first, and twenty-second assignments. These exceptions should have been sustained. Dobbin v. Bryan, 5 Tex. 276; Wright v. Wright, 6 Tex. 16.

[10] The court permitted counsel for appellees to make a statement from the minute book of defendant, showing the extent of the ownership of the capital stock of defendant by Adolphus Busch and his son-in-law, and the admission of this statement to the jury. The fact was wholly immaterial and inadmissible. The matters complained of in the remaining assignments will probably not arise upon another trial, and will not be discussed.

For the errors pointed out, the judgment is reversed, and the cause remanded.